# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

United States of America,

        Plaintiff,     Case No. 16-cr-20047

v.                         Judith E. Levy
                              United States District Judge

Kenneth Wooten,
                              Mag. Judge David R. Grand
        Defendant.

_____/

## OPINION REGARDING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE FROM THE JANUARY 21, 2015 SEARCH [34][1]

On January 21, 2015, three Michigan State Police Troopers went to an address on Abbott in River Rouge, Michigan, to arrest defendant Kenneth Wooten. The address was a two-story house containing a downstairs and upstairs apartment, the latter of which the Troopers learned was defendant's residence. When they arrived, two Troopers remained in the front of the house, and the third went around to the

---

[1] At the close of the July 6, 2017 evidentiary hearing, the Court indicated that it was likely to deny the motion. However, further research and consideration has resulted in a determination that the factual and legal issues here give rise to a substantial possibility that the evidence from the January 21, 2015 search should be suppressed. The undersigned appreciates the work and patience of the parties and their counsel as this issue is resolved.

back of the house.  The lead Trooper knocked on the exterior front door, and a woman inside the upstairs apartment told him she would be right down.  She did not come down.

Another Trooper stationed at the rear of the house saw a shadow through the blinds of the upstairs apartment, which looked like at least one person moving around and doing something with their hands at waist level.  The Trooper who knocked on the front door kept knocking and ringing the bell.  Eventually the tenant in the downstairs apartment, an unidentified woman, answered the door.  That Trooper showed her a picture of Wooten, and she identified the picture as "Ken," the man who lived upstairs.

The two Troopers in front then entered the house, went upstairs, and knocked on the door of the upstairs apartment.  When they arrived, Wooten's girlfriend answered the door, which she did by opening it a few inches and leaving the security chain in place.  Following a request by the Troopers to search the house to look for Wooten, his girlfriend consented to the search for the limited purpose of looking for Wooten inside the house.  While outside the upstairs apartment and while searching the house, the Troopers smelled marijuana and found

2

evidence of what they believed to be drug-dealing activity. The lead Trooper sought permission from Wooten's girlfriend to conduct a full search of the property, and was denied. The Troopers then contacted the Downriver Area Narcotics Agency ("DRANO") with the information they discovered, and DRANO obtained a search warrant for the residence. The search warrant was executed later that night, and DRANO found marijuana, materials used in drug trafficking, two handguns, and mail addressed to Wooten at the Abbott address.

On February 14, 2017, Wooten filed a motion to suppress the evidence obtained from the searches. (Dkt. 34.) The Court held oral argument on the motion on May 9, 2017, and an evidentiary hearing on July 6, 2017.

**I.  Background**

Defendant was indicted on January 21, 2016. (Dkt. 11.) The indictment contains four counts: one count of felon in possession of a firearm, arising from events on January 21, 2015, and counts of possession with intent to distribute a controlled substance, possessing a firearm in furtherance of a drug trafficking crime, and felon in possession of a firearm, each arising from events on January 8, 2016.

On February 14, 2017, defendant filed a motion to suppress the evidence found in the two searches of his home on January 21, 2015. (Dkt. 34.)

The Court held a hearing on the motion on May 9, 2017. Following the hearing, the Court determined that an evidentiary hearing should be held to resolve the factual disputes between the parties regarding whether the Troopers executing the arrest warrant had permission or justification to enter the common area of the home in which defendant lived. That hearing was held on July 6, 2017. The factual background below is drawn from that hearing.

On January 21, 2015, three Troopers assembled to execute an arrest warrant for Kenneth Wooten: Benjamin Sonstrom, Bradley Conner, and John Tibaudo. Wooten had come to Sonstrom's attention because, at some point in 2014, he conducted a traffic stop involving Wooten. (Hearing Tr. at 6-7.) Sonstrom could not recall the exact date of the stop at the hearing. (*Id*. at 45.) During that stop, Sonstrom found what he believed to be heroin on Wooten's person, and arrested Wooten. (*Id*. at 7.) Wooten was fingerprinted and released pending laboratory analysis of the substance found in his car. (*Id*.) Sonstrom

4

made a warrant request of the Wayne County prosecutor's office for Wooten's arrest. (*Id.*) Sonstrom testified that the time between an initial arrest and a warrant issuing from the prosecutor's office could be "at a very minimum . . . a couple of months . . . "up to a couple of a years." (*Id.* at 8.)

At some point, the prosecutor's office issued the arrest warrant, and on January 21, 2015, Sonstrom assembled Conner and Tibaudo to execute the warrant with him. (*Id.* at 9, 71.) The Troopers went to the Abbott Street address Wooten provided during the traffic stop that led to the arrest warrant, at around 9 P.M. (*Id.* at 46, 48.) Sonstrom obtained the address, and provided it to the other Troopers, who had no other independent knowledge about Wooten or where he lived. (*Id.* at 102, 105.) No other surveillance was done to establish that the Abbott Street address was Wooten's, or what his regular schedule was. (*Id.* at 48.) Each of them drove separately to the Abbott Street address in River Rouge. (*Id.* at 11.) The address was identified as Wooten's residence based on the drivers' license he provided at the 2014 traffic stop. (*Id.* at 12.) When the Troopers arrived, Sonstrom directed

Tibaudo to go to the rear of the residence, and for Conner to provide backup at the front of the residence. (*Id.* at 13.)

The Abbott Street address was a single-family home divided into two apartments, with one apartment on the lower floor and one on the upper floor. (*Id.* at 14-15.) Sonstrom could not remember whether he knocked on the door or rang a doorbell, but he did one or the other when each Trooper was in position. (*Id.* at 15.) After Sonstrom did so, a woman looked out of a window in the second-floor apartment and said she would be down to open the door. (*Id.* at 16.) She did not come down, and the Troopers waited for several minutes. (*Id.* at 17.)

Tibaudo, stationed in the rear of the house, saw through closed, backlit curtains in a window a single figure in the upstairs apartment moving around. (*Id.* at 76.) This made him believe there were two people in the house. (*Id.* at 78.) Tibaudo told Conner "that there's someone up in this top right bedroom or whatever it is, top right room." (*Id.*) Sonstrom also recalls being informed by Tibaudo of the presence and movement of the person in the window. (*Id.* at 17-18.) It indicated to him that "[s]omebody's up there and somebody's not coming down. It

gives us the impression that somebody might be trying to hide." (*Id.* at 19.)

Sonstrom continued to knock on the front door, and testified that he did not know whether the door was locked or unlocked. (*Id.*) Conner also testified that he did not know if the door was locked, and did not "think it was ever checked." (*Id.* at 110.) After a few minutes, a woman opened the front door, who appeared to be the resident of the first-floor apartment. (*Id.* at 20.) Sonstrom showed her a picture of Wooten, and she identified Wooten as the man who lived in the upstairs apartment. (*Id.*) Sonstrom does not remember the conversation he had with the woman regarding entry into the house, but noticed a common area leading to the woman's apartment and a stairwell up to the second-floor apartment. (*Id.* at 21.) After talking to the woman, he and Conner entered the building and went up the stairs to the second-floor apartment. (*Id.* at 23, 109.) Neither Sonstrom nor Conner stated that they asked for permission to enter the house. When they began to go up, they alerted Tibaudo to come around the house and watch the front door. (*Id.* at 78-79.) Tibaudo came in the house after Sonstrom and

Conner entered, but could not specifically hear the later conversation Sonstrom had at the door of the upstairs apartment. (*Id.* at 80.)

When they arrived at the front door of the second-floor apartment, a woman named Trina Cooley, later identified as Wooten's girlfriend, opened the door a few inches, leaving the security chain in place. (*Id.* at 24, 30.) Sonstrom believed it to be the same woman who called down from the window when he first knocked on the door or rang the doorbell. (*Id.*) Sonstrom could smell burnt marijuana through the door opening. (*Id.*) He asked if Wooten was in the residence, and the woman told him that Wooten had just left. (*Id.*) She was also looking at an area behind and away from the door. Sonstrom's impression was that "somebody was in that house and was trying to hide." (*Id.* at 25.)

While looking through the door, Sonstrom also noticed cut and folded lottery tickets and razor blades, which are commonly used in packaging powder narcotics. (*Id.*) Sonstrom and Conner asked for permission to search the apartment for Wooten. (*Id.* at 26.) The woman asked why they wanted to search the apartment, and Sonstrom told her they had an arrest warrant. (*Id.*) The woman gave permission for the Troopers to enter, but only for the purpose of looking for Wooten.

8

(*Id.* at 27.) The woman did not provide consent to do a full search of the apartment. (*Id.* at 37.)

When the Troopers entered, they discovered there was a baby in the house, and the woman was the baby's mother. (*Id.*) As they entered, Sonstrom believed that Wooten was actually in the house, because it was his home, it was nighttime, and people were usually home at night. (*Id.* at 28.) At some point, Tibaudo came up the stairs to join Sonstrom and Conner, but did not join the search. (*Id.* at 32, 81-82.) Sonstrom and Conner looked in all the spaces they believed Wooten could reasonably be hiding. (*Id.*) In addition to the lottery tickets and razor blades on the table in the living room, they found a small bag of marijuana and some marijuana wax or marijuana butter, as well as a TV tray that appeared to be covered in narcotics residue. (*Id.* at 34.) The Troopers also searched the common basement of the residence, but found nothing. (*Id.* at 36.)

At that point, the Troopers stopped the search, and Sonstrom contacted DRANO. (*Id.* at 37.) Sonstrum discussed what was found in the apartment with Detectives Rollet and Rozum of DRANO, who then incorporated those findings into a search warrant affidavit. (*Id.* at 39.)

9

The search warrant was approved, and the Troopers waited for DRANO to arrive. (*Id.* at 40.) The Troopers searched the apartment with DRANO. (*Id.* at 41.) At some point during the search, the woman in the apartment called Wooten to inform him that law enforcement was in the apartment and looking to execute an arrest warrant. (*Id.* at 98.) In the search, DRANO discovered two guns in a closet, 14.7 grams of suspected cocaine, one gram of suspected heroin, a digital scale, seven suspected methadone pills, a piece of lottery paper, 3.6 grams of suspected marijuana and wax, a suspected hydrocone pill, a ledger, two containers of powder, and mail. (Dkt. 39-4 at 2.) At some point later that evening, the Troopers arrested Wooten outside the house on the street. (Hearing Tr. at 42, 86.)

Wooten was indicted on four counts on January 21, 2016. (Dkt. 11.) Count One of the indictment charges Wooten with being a felon in possession of a firearm. 18 U.S.C. § 922(g)(1). That charge stems from the January 15, 2015 search of his apartment. (Dkt. 11 at 1.)

**II. Analysis**

Defendant seeks suppression of the evidence found during both the initial search by the Troopers and the subsequent search by DRANO justified by the material found during the initial search.

The primary issue in this case is whether the Troopers' entry into the common-area stairwell violated defendant's reasonable expectation of privacy in that space. Wooten argues that any consent later given by Cooley was the fruit of the poisonous tree, tainted by the illegal entry into the residence. (Dkt. 34 at 9, Dkt. 41 at 6-7.) The government counters that whether or not the officers had permission to enter the common stairwell, Cooley's consent at the locked door to Wooten's unit rendered the search lawful. (Dkt. 39 at 8-10.) Wooten also argues that the Troopers lacked reasonable cause to go to the Abbott Street address to arrest Wooten, and to enter without Cooley's consent.

### A. Defendant's Reasonable Expectation of Privacy

To demonstrate a reasonable expectation of privacy, a criminal defendant must "show that he had a subjective expectation of privacy and [] that his expectation was objectively reasonable." *United States v. Washington*, 573 F.3d 279, 282-83 (6th Cir. 2009) (citing *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000)). In the Sixth Circuit, "a

tenant in a locked apartment building has a reasonable expectation of privacy in the common areas of the building not open to the general public." *United States v. Kimber*, 395 F. App'x 237, 246 (6th Cir. 2010) (quoting *United States v. Carriger*, 541 F.2d 545, 552 (6th Cir. 1976)). When "an officer enters a locked building, without authority or invitation, the evidence gained as a result of his presence in the common areas of the building must be suppressed." *Carriger*, 541 F.2d at 552. Further, intervening consent to the search does not purge the taint of the illegal entry, and the fruits of the consensual search should be suppressed. *United States v. Heath*, 259 F.3d 522, 534 (6th Cir. 2001). "[D]uplex tenants have a greater expectation of privacy than tenants of a large multi-unit apartment building." *United States v. Dillard*, 438 F.3d 675, 684 (6th Cir. 2006). However, a tenant does not have "an objectively reasonable expectation of privacy in the unlocked and open common hallway and stairway of his duplex." *Id.*

The evidentiary hearing was a detailed, thorough exploration of the relatively short period of time between when the three Troopers arrived at the Abbott Street residence and when DRANO searched Wooten's apartment. However, the point at which the Troopers entered

12

the common area of the duplex leaves some uncertainty as to what happened.

Sonstrom and Conner, the Troopers stationed at the front of the duplex, either knocked on the door or rang the doorbell, and waited for the woman in the upstairs apartment to come downstairs to let them in. She did not, however. Instead, the tenant in the lower apartment came to the front door, opened it, and told the Troopers that Wooten lived in the upstairs apartment. At that point, they entered. None of the Troopers testified that they asked for or received permission to enter, but neither did they testify whether the door was locked or unlocked.

The record does not show whether the front door of the house was locked. Wooten has offered no evidence to show that the front door of the duplex leading to the common area hallway and stairway was routinely locked. "[A] duplex common hallway and stairway are used by people other than the tenants." *Dillard*, 438 F.3d at 684. When the door leading to a common hallway and stairway are unlocked, there is no objectively reasonable expectation of privacy in that space. *Id*.

To find that a door was locked, there must be some affirmative evidence in the record showing that it was normally locked or locked at

the time of the entry by law enforcement. *See, e.g., Carriger*, 541 F.2d at 548 (evidence showing that a police officer found both front and back doors locked, and slipped into an open door behind entering workmen); *Heath*, 259 F.3d at 534 (evidence showing that officers took keys from a suspect and used those keys without proper consent to enter a locked apartment building); *United States v. Kimber*, 395 F. App'x 237, 247-48 (6th Cir. 2010) (evidence showing that officers circumvented a keypad lock by forcing it open using a technique demonstrated by another individual).

As the record stands, it is unclear whether the front door was normally locked, or locked at the time the Troopers came to the residence. None of the Troopers testified that they attempted to open the door and found it locked, or heard the downstairs tenant unlock the door before she opened it. The Troopers had never been to the house before, and had no knowledge of whether the front door was locked; they did not even appear to know whether the house was a single-family residence or a duplex before they arrived.

A briefing schedule is set forth below to determine if this question can be answered.

## B. Reasonable Belief

In this case, if the Court finds that the Troopers entered an area in which Wooten had no reasonable expectation of privacy, and went up the stairs to what they were informed by the downstairs tenant was Wooten's residence, the Court would also find that they had reasonable cause to do so. When the Troopers arrived at the front door of Wooten's apartment, Wooten's girlfriend opened the door and, after a discussion, consented to let the Troopers in for the limited purpose of searching for Wooten.

In *Payton v. New York*, the Supreme Court held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 U.S. 573, 603 (1980). Wooten argues, based on *Payton* and its progeny, that law enforcement must have a reasonable belief that the subject of an arrest warrant is at an address at the time the warrant is executed, before entering the address. (Dkt. 41 at 7.)

Wooten relies primarily on *United States v. Pruitt*, 458 F.3d 477 (6th Cir. 2006) in support of this contention. In *Pruitt*, the Sixth

Circuit, interpreting *Payton*, found that law enforcement, in order to search a home without the consent of the persons within based on an arrest warrant, must have a reasonable belief that the subject of the arrest warrant is within. *Id*. at 482. "Reasonable belief is established by looking at common sense factors and evaluating the totality of the circumstances." *Id*. (citations omitted). It is a lesser standard than probable cause. *Id*. In a subsequent letter to the Court, Wooten also cites *United States v. Hardin*, 539 F.3d 404 (6th Cir. 2008), in which the Sixth Circuit analyzed another case of non-consensual entry by law enforcement based on an arrest warrant. *Id*. at 408.

The search in this case was based on the consent of the inhabitant of the apartment, which makes both *Pruitt* and *Hardin* inapplicable. Instead, all available evidence shows that the woman in Wooten's apartment had actual authority to permit the Troopers to search the residence. The woman was Wooten's girlfriend, and resided in the home with Wooten and her child. Actual authority for a third party to consent to a search of a space shared with another "rests on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-

inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the [property] to be searched." *United States v. Purcell*, 526 F.3d 953, 962 (6th Cir. 2008) (citing *United States v. Matlock,* 415 U.S. 164, 171 n. 7 (1974)).

Wooten also argues that even if his girlfriend could have consented, she did not. (Dkt. 41 at 7-8.) His primary argument is that "[c]onsent cannot be deemed voluntary when it is represented by officers that they in fact have a warrant, even if the warrant representation is valid." (*Id.* at 8 (citing *Bumpers v. North Carolina*, 391 U.S. 543 (1968)). There, the Supreme Court held that a prosecutor cannot show that consent was "freely and voluntarily given . . . by showing no more than acquiescence to a claim of lawful authority." *Bumpers*, 391 U.S. at 548-49. Specifically, law enforcement cannot claim authority to search a home under a warrant and deem the permission of a person to enter consensual because "[t]he situation is instinct with coercion – albeit colorably lawful coercion. Where there is coercion there cannot be consent." *Id.* at 550.

But there was no coercion here because, based on the testimony presented, the Troopers never claimed authority to search the home under an arrest warrant or a search warrant. Instead, they informed Wooten's girlfriend that they possessed an arrest warrant, and asked permission to search for Wooten without representing that they had the legal authority to search the apartment if consent was not given. Her acquiescence to a limited search was freely and voluntarily given, and has been established by "clear and positive testimony." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). This is further supported by the fact that the Troopers asked Wooten's girlfriend for consent to perform a full search of the residence, which she refused.

### III. Conclusion

The record is unclear on the lynchpin issue that would determine the constitutionality of the Troopers' entry and subsequent search: whether the front door was normally locked and/or locked when the Troopers arrived at the residence. Accordingly, Wooten is ordered to provide any evidence, including but not limited to affidavits or declarations from the owner of the property, the landlord, or any tenants who resided at the property on January 21, 2015 (including

18

Wooten), as to whether the front door of the house was regularly locked, or locked at the time the Troopers arrived. This evidence should be filed with the Court on or before September 8, 2017, and the United States may respond on or before September 29, 2017.

The Court will issue a final order on Wooten's motion to suppress after receiving and reviewing any evidence provided.

Dated: August 15, 2017　　　　　　s/Judith E. Levy
Ann Arbor, Michigan　　　　　　　JUDITH E. LEVY
　　　　　　　　　　　　　　　　United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 15, 2017.

　　　　　　　　　　　　　　　　s/Shawna Burns
　　　　　　　　　　　　　　　　SHAWNA BURNS
　　　　　　　　　　　　　　　　Case Manager